# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DOROTHY MOLITOR,

      Plaintiff,

v.                                Case No. 11-15556

HENRY FORD HEALTH SYSTEM,

      Defendant.

_____/

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Dorothy Molitor sues her former employer, Defendant Henry Ford Health System ("HFHS") alleging discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and state law. Defendant moves for summary judgment. The matter is fully briefed, and no hearing is needed. *See* E.D. Mich. LR 7.1(f)(2). For the foregoing reasons, Defendant's motion for summary judgment will be denied in part and granted in part.

## I. BACKGROUND

In 2000, Plaintiff began working as a chemical dependency therapist at HFHS's Center for Health Promotion and Disease Prevention ("CHPDP"). (Dkt. # 19 at Pg ID 228-29.) Plaintiff was later promoted to manager of Tobacco Treatment Services ("TTS"), one of four cost centers within CHPDP. (*Id.* at Pg ID 230, 274.) As manager of TTS, Plaintiff was "[responsible] for all operational aspects of [TTS], services and activities across HFHS." (Dkt. # 24 at Pg ID 554.) She also supervised four TTS counselors including Sherry Thomas and Robert Jackson. (Dkt. # 19 at Pg ID 177.)

In 2008, Plaintiff was diagnosed with cardiomyopathy, (*Id.* at Pg ID 235), a "disease of the heart muscle that decreases [the] heart's ability to pump blood," *Cardiomyopathy Overview,* Cleveland Clinic, http:// my.clevelandclinic.org/ heart/ disorders/ heartfailure/ cardiomyopathy.aspx (last visited August 21, 2013) (the rendering of this URL contains spaces).  Plaintiff's symptoms include shortness of breath, fatigue, chronic cough, depleted energy, and difficulty moving.  (Dkt. # 24 at Pg ID 517-18.)

In early 2009, Plaintiff began reporting to newly appointed interim Medical Director for CHPDP, Dr. Sharon Milberger.  (Dkt. # 19 at Pg ID 272-3.)  Amanda Holm, Manager of another cost center, Prevention Research ("PR"), as well as Linda Perry, CHPDP office coordinator, also reported directly to Milberger.  (*Id.* at Pg ID 232, 278.)  In her new role, Milberger relied on CHPDP's Human Resources Manager, Kathy Macki.  (*Id.* at Pg ID 273, 291.)  Plaintiff, age 59/60, is older than Perry, age 46, Milberger, age 45, Macki, age 40, and Holm, who is under age 40.  (Dkt. 24 at Pg ID 463.)[1]

In February 2009,[2] Plaintiff complained to Milberger and Macki about Perry's "harassment" and creation of a "hostile work environment."  (*Id.* at Pg ID 486.)  Several meetings and emails with Milberger and Macki followed Plaintiff's initial verbal complaint.  (*Id.*)  Perry, whom Plaintiff often referred to as a "workplace bully," (*see, e.g.,*

---

[1] These ages reflect the individuals' respective ages at the time of the events in question.

[2] Initially, in her deposition, Plaintiff incorrectly stated that she first complained in February *2008*, (Dkt. # 24 at Pg ID 521), but later testified that it was, in fact, in 2009 (*Id.* at Pg ID 543.)

2

*id.* at Pg ID 525), was the focus of each meeting and email—sometimes it was about her individual treatment of Plaintiff, (*see, e.g., id.* at Pg ID 521), sometimes her collective treatment of Plaintiff and her team, (*see, e.g., id.* at Pg ID 591), and sometimes both (*see, e.g., id.* at Pg ID 663-34).

In April 2009, Plaintiff took a three-week leave of absence under the Family Medical Leave Act ("FMLA") for surgery related to her condition.  (Dkt. # 19 at Pg ID 245-46.)  Upon returning from FMLA leave, pursuant to a verbal agreement between Plaintiff and Milberger, Plaintiff was allowed to work from home on days she had doctors appointments related to her surgery or felt she needed a less stressful work environment.[3]  (*Id.* at Pg ID 307.)  Subsequently, in a September 24, 2009 letter of expectations, Milberger instructed Plaintiff:

> If you are not feeling well due to your FMLA health condition, you need to call in and not work from home that day.  The expectation is that you contact me directly via email or phone.  Under the federal guidelines, you are entitled to up to 480 hours per rolling calendar year for job protection.  You must get prior approval from me if you would like to work from home.

(*Id.* at Pg ID 374.)

On September 24, 2009, Plaintiff submitted to Milberger and Macki a written complaint entitled "Complaint of a Hostile Work Environment and Conflict of Interest," signed by Plaintiff and the four counselors she supervised.  (Dkt. # 24 at Pg ID 468.)  Plaintiff was terminated on October 22, 2009.  (Dkt. # 19 at Pg ID 266.)  After receiving

---

[3] Plaintiff had previously obtained remote access to HFHS's computer system in June 2007.  (*Id.* at Pg ID 243.)  At that time, prior to Milberger's appointment, there were no formal procedures, but, TTS employees, including Plaintiff, were allowed to "[take] administrative time at home."  (*Id.*)

3

a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"),

Plaintiff timely sued Defendant.[4]

## II.  STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "In deciding a motion for summary judgment, the court must view the evidence in

the light most favorable to the non-moving party, drawing all reasonable inferences in

that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute

as to a material fact.  *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986).  The burden

then shifts to the nonmovant, who must put forth enough evidence to show that there

exists "a genuine issue for trial."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004)

(citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment, therefore, is not appropriate when "the evidence presents a

sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly

supported motion for summary judgment—the disputed factual issue must be material.

A fact is "material" for purposes of summary judgment when proof of that fact would

establish or refute an essential element of the claim or a defense advanced by either

party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

---

[4] Additional facts will be discussed, as necessary, in the Discussion section, *infra*.

### III.  DISCUSSION

Plaintiff alleges eight causes of action: (1) ADEA age discrimination; (2) Elliot-Larsen Civil Rights Act ("ELCRA") age discrimination; (3) ADEA retaliation; (4) ELCRA retaliation; (5) failure to accommodate in violation of the ADA; (6) ADA discrimination and retaliation; (7) failure to accommodate in violation of the Persons with Disabilities Civil Rights Act ("PWDCRA"); and (8) PWDCRA discrimination and retaliation.  Plaintiff also alleges a hostile work environment claim under counts one and two only.  It is unclear why Plaintiff's claims for discrimination and retaliation are sometimes separated into different counts and other times combined under one.  For the sake of consistency and thoroughness, each count will be addressed in turn.

### A.  ADEA Age Discrimination

### 1.  Age Discrimination

To establish a *prima facie* case of age discrimination under the ADEA, Plaintiff must show that: "(1) he [or she] was at least 40 years old at the time of the alleged discrimination; (2) he [or she] was subjected to an adverse employment action; (3) he [or she] was otherwise qualified for the position; and (4) he [or she] was replaced by a younger worker."  *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 489 (6th Cir. 2012) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008)).[5]  "The fourth element may be satisfied by showing that similarly situated non-protected employees

---

[5] To the extent that Plaintiff offers Perry's alleged age-based comments, discussed *infra*, as direct evidence, her claim fails because "discriminatory statements must come from decision makers to constitute evidence of discrimination."  *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (quotations omitted).  It is undisputed that Perry had neither supervisory authority over Plaintiff nor ability to discipline or terminate her.  (Dkt. # 19 at Pg ID 245.)

were treated more favorably." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). If Plaintiff makes this showing, the burden of production shifts to Defendant to articulate a nondiscriminatory reason for its action. *Harris v. Metro. Gov't*, 594 F.3d 476, 485 (6th Cir. 2010). If Defendant does so, the burden of production shifts back to Plaintiff to show that Defendant's proffered reason was mere pretext for intentional age discrimination. *Id.* "The plaintiff retains the ultimate burden of proving that age was the but-for cause of the employer's adverse action." *Id.* (quotations omitted).

Defendant first argues that Plaintiff's claim fails because she was not replaced by a younger employee. Specifically, Defendant argues that Plaintiff's position was eliminated, *i.e.,* that terminating Plaintiff was a work force reduction. (Dkt. # 19 at Pg ID 215.) "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Geiger*, 579 F.3d at 623 (quotations omitted). In work force reduction cases, a plaintiff must meet a heightened standard to establish her *prima facie* case. *Geiger*, 579 F.3d at 623. The fourth element is modified such that Plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* (quotations omitted).

A genuine issue of material fact remains regarding whether Plaintiff's position was ultimately eliminated. "An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Id.* A person is replaced, "only when another employee is hired or reassigned to perform the plaintiff's duties, . . . not . . . when his duties are absorbed by another person or when the work is

6

redistributed among other existing employees already performing related work."
Combining two positions into one is not a replacement. *Id.* The parties agree that
initially Milberger absorbed Plaintiff's job duties in addition to her own. However, at
some point, Milberger stopped–and Holm began–to supervise the TTS counselors. The
parties disagree as to when this shift occurred and the record is ambiguous. Jackson
testified that Holm assumed this supervisory role "sometime between January and April
2010." (Dkt.# 19 at Pg ID 351.) According to Thomas, it was within "90 days" of
Plaintiff's termination. (*Id.* at Pg ID 359.) Milberger herself appears confused. Initially,
Milberger testified that she held Plaintiff's supervisory responsibilities over the TTS
counselors for "at least a year." (*Id.* at Pg ID 274.) But on the question of when Holm
"moved into the management position" of TTS, Milberger testified, "I think it kind of
morphed over time . . . . [S]he has a significant amount of expertise in tobacco, and my
responsibilities continued to grow." (*Id.*)

Importantly, Plaintiff's job description and one of the goals listed in Holm's most
recent performance evaluation contain nearly identical language. As manager of TTS,
Plaintiff was "[responsible] for all operational aspects of [TTS], services and activities
across HFHS." (Dkt. # 24 at Pg ID 554.) Holm's most recent performance evaluation
states, as a goal, that she "assume full responsibility for the day-to-day operation and
management of CHPDP's [TTS]." (Dkt. # 19 at Pg ID 445.) This goal is listed to have a
weight of "80%." (*Id.*) The evaluation is replete with references to TTS but makes no
mention of PR. (Id. at Pg ID 441-48.) Also, another manager was hired subsequent to
Plaintiff's termination such that CHPDP continues to have two managers that both
report to Milberger. (Dkt. # 24 Pg ID 634.)

7

Thomas' deposition testimony provides additional support for Plaintiff's theory that her position was not eliminated.  Macki and Milberger held a meeting with the TTS counselors to announce that Holm would be their new supervisor.  Thomas testified:

> A: [M]acki said she wanted to let us know that Amanda Holm would be our new manager, and she also let us know that as a show of comfort or I don't know what the wording was but something about comfort, take comfort in knowing that we did look at all of you three, the three counselors that were there, as options for the management position. But it was decided that it would be given to Amanda Holm.
>
> . . .
>
> A: I asked Kathy Macki directly why were we going to have a manager when we were told that we weren't going to have a manager anymore. We were told that the management position was eliminated and now we were getting a new manager.  The question was never responded to.
> Q: Did she just not say anything?
> A: She just said, you know, this is—I'm not sure of her exact wording, but whatever she said that kind of like breezed over my question.  She pretty much said, to put it bluntly, this is the way that it is.  She said that because Amanda Holm was already, quote/unquote, project manager that it was just an easier move, not a lateral move, but some type of terminology in that sense.  And that she would be our manager effective immediately. That was pretty much the end of that.

(*Id.* at 359.)  That the three TTS counselors were considered for the TTS management position, in addition to Holm, may suggest that the management position continued to exist after Plaintiff's termination.

It is also unclear from the record whether Holm's new supervisory role was *instead of* managing PR *or in addition to* that position.  The former circumstance suggests that Plaintiff's position was effectively reassigned to Holm, meaning Plaintiff was replaced.  The latter circumstance suggests the opposite.  According to Jackson, Holm currently has "co-responsibilities.  She still does research, she also manages the tobacco treatment services program."  (*Id.* at pg ID 352.)  Milberger's testimony provides little clarification:

8

> Q: Ms. Molitor's position is currently being done by Amanda Holm, correct?
> A: Yes.
> Q: She's a manager, correct?
> A: Yes.
> Q: So the manager position wasn't ultimately eliminated?
> A: It was.
> Q: If Amanda Holm is doing that position how is it eliminated?
> A: Because the position, Dorothy's position, she left, I filled the responsibilities, Amanda was already a manager, she's still a project manager.
> Q: But she's doing Ms. Molitor's job supervising the counselors, correct?
> A: Yes.

(Dkt. # 19 at Pg ID 307.)  Jackson's statement that Holm still does research is the only suggestion in the record that Holm's new supervisory role of the TTS counselors may be supplemental to managing PR.

In its reply, Defendant emphasizes that Holm "*remains* a project manager."  (Dkt. # 27 at Pg ID 767.)  This argument misses the mark.  Holm was manager of PR and is now manager of TTS; her title, "manager," has not changed.  The material factual dispute is not about her title but instead concerns whether Holm's responsibilities have changed.  *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 373 (6th Cir. 1999) (noting that employees were not replaced because "[t]hey both maintained their prior job titles and responsibilities.").  Moreover, "an employer [cannot] avoid liability by changing the job title or by making minor changes to a job indicative of an attempt to avoid liability." *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001).

A material factual dispute also remains regarding Defendant's theory that Plaintiff was not replaced because her former duties were "spread around."  *See Nordahl v. Studer Revox Am., Inc.*, 78 F.3d 585, at *3 (6th Cir. 1996) ("It is well-established that spreading the former duties of a terminated employee among the remaining employees

does not constitute replacement."). Aside from Amanda Holm, the only individual who took on any of Plaintiff's former duties was Thomas and those duties appear to include relatively minor tasks such as "scheduling and planning events." (*Id.* at pg ID 358-9.) Yet Thomas testified that she found Plaintiff's termination "deceptive" because "we were told by Kathy Macki . . . that the management position had been, quote/unquote, eliminated and that we were going to report directly to our director . . . . [T]hat turned out not to be the case." (Id. at Pg ID 360.) Macki's testimony is similarly unhelpful:

> A: I remember that after the separation, the severance agreement was initiated with Ms. Molitor, I do recall having a conversation with Dr. Milberger and explaining to her very specifically if you eliminate this position, that means you can't go back and hire another manager. That position is wiped out, it's eliminated, we won't even go back and revisit it. And I asked the question is it true because of budget remediation, and the response was yes. I asked her how she was going to divide up that work or was that work still needed. She said some of the duties were no longer needed, some of the duties she was going to be responsible for as far as she was going to take on the immediate supervision of all the counselors and that the—some of the counselors were going to pick up some of Ms. Molitor's responsibilities.
> Q: Did she tell you what duties were going to be eliminated?
> A: No. I just remember her telling me that some of the things could be eliminated but I don't recall specifically what they were. But the other duties and responsibilities were going to be divided up among the team.
> Q: Did she tell you what responsibilities and duties she was going to take responsibility for?
> A: Specifically, and I asked, all of the counselors were going to report directly to Dr. Milberger. So that was the key responsibility that she was going to take on what Ms. Molitor had.
> Q: Did she talk about what duties the counselors were doing to be responsible for?
> A: Somebody was going to pick up part of the marketing strategy specifically, but I don't remember the rest of what the duties were.

(Dkt. # 19 at Pg ID 336.) This does not appear to be a case in which Holm's duties "slightly overlap" with Plaintiff's former duties. *Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 489 (6th Cir. 2012). Similarly, it does not appear that the "vast

10

majority" of Plaintiff's responsibilities were redistributed.  *Id; see also Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 290 (6th Cir. 2012) (noting that Plaintiff was not replaced when another employee took over a duty that "did not make up a substantial portion of Plaintiff's duties".).

Recently, the Sixth Circuit clarified that to establish a *prima facie* case in the context of a work force reduction, Plaintiff must show that her qualifications were superior to that of her younger replacement.  *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010).  The court explained that Schoonmaker could not rely on *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421 (6th Cir.1999), because in that case, "[P]laintiff was the most competent member of his peer group, as measured by objective, company-established criteria," whereas *Schoonmaker* based her claim on the mere fact that she was fired and a younger person was retained in the same position.  *Id*.  Here, Plaintiff's evidence falls somewhere in between the respective strength of the evidence presented in *Schoonmaker* and *Skalka*.  Plaintiff has not provided objective data demonstrating her competence.  However, the counselors she managed were unhappy when Plaintiff left. (Dkt. # 24 at Pg ID 625.)  Jackson was unhappy because he was "developing as a counselor under [Plaintiff's] tutelage" and "[Plaintiff] was a good manager." (*Id*.) Thomas even stated that "[Plaintiff] was the best manager I ever had." (*Id.* at Pg Id 634.)  Both Jackson and Thomas also testified that they had no concerns about Plaintiff's technological abilities or capacity to learn new things.  (*Id.* at Pg ID 625, 634.) It is also undisputed that although Holm had experience in tobacco research and advocacy, she had never held a counseling or treatment position with respect to

11

tobacco prior to her appointment as TTS manager.  (*Id.* at Pg Id 577.)  The fact that Plaintiff is more than twenty years older than Holm further supports an inference of discriminatory intent.  *Blizzard*, 698 F.3d at 283 ("An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant . . . [A]n age difference of ten or more years is generally considered significant.").  Taken together, "the evidence [is] sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the Plaintiff because of age."  *Geiger*, 579 F.3d at 624.

Defendant next argues that Plaintiff has not demonstrated a *prima facie* case because she was not treated less favorably than similarly situated younger employees.  Because a material factual dispute remains as to whether Plaintiff was replaced, Defendant's second argument need not be addressed.

A material factual dispute remains regarding whether Plaintiff's position was, or was not, "eliminated."  Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's claim for age discrimination under the ADEA will be denied.

## 2.  Hostile Work Environment

For *a prima facie* hostile work environment claim under the ADEA, Plaintiff must establish that: "(1) the employee is 40 years or older, (2) the employee was subjected to harassment, either through words or actions, based on age, (3) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer."  *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 337 (6th Cir. 2012) (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830,

834–5 (6th Cir. 1996)).  An environment is characterized as hostile based on the totality

of the circumstances.  *Id.*  Considerations include "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Id.*  This test is both subjective and objective: "the conduct must be

severe or pervasive enough to create an environment that a reasonable person would

find hostile or abusive and the victim must subjectively regard that environment as

abusive."  *Hale*, 503 F. App'x at 337 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d

456, 463 (6th Cir. 2000)).

Plaintiff testified that Perry made comments "about retiring, comparing

me/contrasting with younger counselors as they are young and enthusiastic, about

technical skills and ability to learn new ones."  (Dkt. # 19 at 238.)  Specifically, Perry

repeatedly asked Plaintiff: "aren't you ready for retirement?" and "when are you going to

retire?"  (*Id.* at Pg ID 239.)  On one occasion Perry also told Plaintiff that "Michelle

should do that [training and orientation for a new employee] because she is young and

enthusiastic."  (*Id.*)  Plaintiff claims that because "there was so much energy and focus

on all these comments . . . it disrupted my work flow.  It was distracting."  (*Id.* at Pg ID

240.)

Plaintiff's hostile work environment claim fails because the alleged harassment

she identifies is not "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  *Williams v. CSX Transp.*

*Co., Inc.*, 643 F.3d 502, 514 (6th Cir. 2011) (citations omitted).  The infrequency of

Perry's comments undermines Plaintiff's claim.  *Cf. Brennan v. Metropolitan Opera*

13

*Assoc.,* 192 F.3d 310, 319 (2d Cir. 1999) (holding that Plaintiff's exposure to lewd pictures *everyday* supported her sex-based hostile work environment claim). When asked how many times Perry asked Plaintiff about retirement, she stated, "I cannot give a reasonable estimate or an accurate estimate . . . It happened more than five times." (Dkt. # 19 at Pg ID 239.) Additionally, the comments were not "particularly severe or degrading." *Crawford,* 96 F.3d at 836 (holding that supervisor's comment that she did not "think women over 55 should be working," was "unenlightened and logically indefensible" and the comment that "[o]ld people should be seen and not heard" was "certainly rude," but that these statements were not "particularly severe or degrading."). More recently, in *Moody v. U.S. Sec. of the Army,* 72 F.App'x 235, 238–39 (5th Cir. 2003), the fifth circuit held that comments and questions including "Granny, have you not got anything to do," "see that old woman and she will take care of you," "old woman, when are you going to retire and go home so someone younger can have a job?" and "Granny, when are you going to retire and let someone younger have a job?" did not create an abusive work environment. Finally, the fact that Perry made some of her comments outside of Plaintiff's presence, further weakens her claim. *See Kurth v. City of Inkster*, 10-11973, 2011 WL 2682965 (E.D. Mich. July 11, 2011) (citing *Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 501 (6th Cir. 2009) ("Sex-based comments need not be directed at a plaintiff to constitute conduct violating Title VII ... [but] this fact contributes to our conclusion that the conduct here was not severe enough.").

A jury could not reasonably find that Perry's age-based comments created a hostile work environment under the ADEA. Plaintiff claims that she had to work at home because Perry's comments caused her too much stress given her cardiomyopathy.

14

(Dkt. # 24 at Pg ID 523.)  While subjectively she may have found the comments abusive, under the ADEA, as stated previously, the alleged hostile behavior is judged not only under a subjective standard but also under an objective, reasonable person standard.

Perry's other comments and actions are insufficient for a hostile work environment claim.  In addition to the age-related comments, Plaintiff testified that Perry made other "derogatory" comments including that Plaintiff "wasn't competent," "had no authority or power," and that she was "a real snot."  However, as Plaintiff concedes, these comments were not related to Plaintiff's age and therefore not cognizable under the ADEA.  *See Speck v. City of Memphis*, 370 F. App'x 622, 626 (6th Cir. 2010) (explaining that Plaintiff's hostile work environment claim failed because, under the ADEA, Plaintiff must "show that the harassment was based on age") (quotations omitted); *see also Perkins v. Harvey*, 368 F. App'x 640, 646 (6th Cir. 2010) ("The most fundamental problem . . . is that . . . [n]one of the allegations made by the appellant contain any hint of facts that would permit a rational factfinder to infer that racial animus played a part in what appear to have been garden-variety personality conflicts between people living and working in close quarters.").  Finally, Perry's other actions that Plaintiff identifies as harassment–delaying Plaintiff's work requests and supply orders, not copying Plaintiff on emails, failing to make billing corrections, and questioning and directing Plaintiff's staff–have no connection to Plaintiff's age aside from Plaintiff's self-serving assertions that they were related.  (Dkt. # 24 at Pg ID 497.)

In addition to Perry's behavior, Plaintiff testified that Milberger questioned Plaintiff repeatedly and scrutinized Plaintiff and her staff more than other CHPDP employees.

15

(Dkt. # 19 at Pg ID 259.)  However there is no indication from the record that such questioning and scrutiny was a product of age-based animus, and even if there were, Milberger's conduct it is not sufficiently severe or pervasive for an actionable age-based discrimination claim under the ADEA.  Moreover, Plaintiff appears to have waived this argument as she did not mention it in her response.

Defendant's motion for summary judgment regarding Plaintiff's hostile work environment claim under the ADEA will be granted.

### B.  ELCRA Age Dsicrimination

The ECLRA prohibits "discriminat[ing] against an individual with respect to employment . . . because of . . . age."  Mich. Comp. Laws § 37.2202(1)(a).  ELCRA age discrimination claims are analyzed under the same standards as ADEA age discrimination claims.  *Geiger,* 579 F.3d at 625.  As noted previously, Plaintiff also asserts a hostile work environment claim under the ELCRA.  Unlike the ADEA, the ELCRA is not limited to discrimination claims on the basis of age.  However, Plaintiff's complaint states that Defendant "create[d] a hostile environment on the *basis of Plaintiff's* age."  (Dkt. # 1 at Pg ID 7 (emphasis added).)

Because Defendant's motion for summary judgment with respect to Plaintiff's claim for age discrimination under the ADEA will be denied, summary judgment with respect to Plaintiff's claim for ELCRA age discrimination claim will be denied as well.  And, just as Defendant's motion for summary judgment regarding Plaintiff's hostile work environment claim under the ADEA will be granted, so to will Defendant's motion for summary judgment regarding Plaintiff's hostile work environment claim under the ELCRA.

16

## C.  ADEA Retaliation

For a *prima facie* case of retaliation under the ADEA, Plaintiff must establish that: (1) she engaged in protected activity when she made her age discrimination complaint; (2) Defendant knew about her exercise of the protected activity; (3) Defendant thereafter took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action.[6]  *Fox v. Eagle Distrib. Co.,* 510 F.3d 587, 591 (6th Cir. 2007).  As with age discrimination claims, if Plaintiff establishes a *prima facie* case, the burden of production shifts to Defendant to "articulate some legitimate, nondiscriminatory reason for [its action]."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If Defendant succeeds in doing so, then the burden shifts back to Plaintiff to demonstrate that Defendant's "proffered reason was not the true reason for the employment decision."  *Tuttle,* 474 F.3d at 320 (quotations omitted).

Plaintiff alleges that Defendant retaliated against her for filing complaints about Milberger and Perry.  A complaint may constitute protected activity under the ADEA if it opposes "allegedly unlawful practices."  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008).  However, a Plaintiff's expression of opposition must concern a violation of the ADEA to receive protection under the ADEA.  *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007); *see also* 29 U.S.C. § 623(d) (the ADEA's opposition clause prohibits discrimination against an employee because she has

---

[6] The Sixth Circuit has stated that Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision. *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007). Therefore, relying on cases construing Title VII is permissible to interpret the ADEA's anti-retaliation clause. *Id.*

17

2:11-cv-15556-RHC-RSW   Doc # 28   Filed 09/30/13   Pg 18 of 28   Pg ID 805

"opposed any practice made unlawful by this section").  Further, to prevail, Plaintiff must

prove that she took an "overt stand against suspected illegal discriminatory action . . . .

[A] vague charge of discrimination" will not suffice.  *Blizzard*, 698 F.3d at 288.

Because Plaintiff's complaints did not allege any unlawful discriminatory

practices, they do not constitute protected activity.  Plaintiff notes that the EEOC

Compliance Manual states: "A complaint about an employment practice constitutes

protected opposition only if the individual *explicitly or implicitly* communicates a belief

that the practice constitutes unlawful employment discrimination."  2 EEOC Compliance

Manual § 8–II(B)(2) 915:003 (May 20, 1998) (hereinafter EEOC Compliance Manual).

However, Plaintiff's complaints, including her final "Complaint of a Hostile Work

Environment" never state–explicitly or implicitly–that the alleged conduct was due to her

age.  In fact, as noted previously, Plaintiff's complaints often reference Perry's collective

treatment of Plaintiff and her staff, and thus could not be based on *Plaintiff's* age or

disability.  (*See, e.g.*, Dkt. # 19 at Pg ID 387 (stating that Perry "makes slanderous

comments *about me and TTS staff*," and made "demeaning comments *about me and

the counselors*") (emphases added).)

This court also notes that the EEOC manual provision that Plaintiff cited provides

several examples that Plaintiff failed to include.  Example 4 is instructive here:

> CP (African-American) requests a wage increase from R, arguing that he
> deserves to get paid a higher salary.  He does not state or suggest a belief
> that he is being subjected to wage discrimination based on race.  There also
> is no basis to conclude that R would reasonably have interpreted his
> complaint as opposition to race discrimination because the challenged
> unfairness could have been based on any of several reasons.  CP's protest
> therefore does not constitute protected "opposition."

18

EEOC Compliance Manual.  Plaintiff's complaint can be analogized to the manual's example: Plaintiff complained that Perry created a hostile work environment, yet she provided no basis for Defendant to reasonably interpret her complaints as opposition to age or disability discrimination because they could have been based on many reasons. Therefore, Plaintiff's complaints do not constitute protected "opposition."[7]  To be clear, Plaintiff's claim does not fail because she did not use the word "discrimination" or "retaliation"; Plaintiffs claim fails because the facts she alleged in her complaints could not "reasonably have been interpreted as opposition to employment discrimination." EEOC Compliance Manual; *see also Fox*, 510 F.3d at 591-92 (6th Cir. 2007) (holding that plaintiff's letter to Human Resources complaining about unfair treatment in general was not protected activity because the letter did not specifically complain about age discrimination).

Finally, the court agrees with Defendant that "Plaintiff claims that she reported Perry's age comments to Macki" but "[n]one of the cited deposition pages support Plaintiff's claim."  (Dkt. # 27 at Pg ID 768.)  Moreover, in Plaintiff's response, the fact section entitled "Molitor Reports Harassment and a Hostile Work Environment" does not mention Perry's age-related comments.  (Dkt. # 24 at Pg ID 486.)  Plaintiff argues that she is entitled to adverse inferences arising from Defendant's inability to locate Macki's

---

[7] Plaintiff also failed to mention the (pertinent) footnote associated with the selection she cited which states: *"See, e.g., Barber v. CSX Distrib. Services*, 68 F.3d 694 (3d Cir. 1995) (plaintiff's letter to defendant's human resources department complaining about unfair treatment and expressing dissatisfaction that job he sought went to a less qualified individual did not constitute ADEA opposition because letter did not explicitly or implicitly allege that age was reason for alleged unfairness)."  EEOC Compliance Manual.

notes from her meeting with Plaintiff about Perry.  (*Id.* at pg ID 492-94.)  Apparently,
Plaintiff is hopeful that Macki's notes said that Plaintiff had raised Perry's age-based
comments.  However, as already mentioned, Plaintiff did not testify that she complained
of Perry's age-related comments.  In support of her argument, in her response, Plaintiff
states that she "addressed [Macki's] notes at length in her Motion to Compel."  (Dkt. #
24 at Pg ID 492.)  Yet Plaintiff withdrew her motion to compel.  (Dkt. # 25.)  In any
event, Plaintiff's motion to compel does not reference Perry's age-related comments.
(*Id.*)

Moreover, Plaintiff is only entitled to an adverse inference if she proves that: (1)
the party in control of the evidence had an obligation to preserve it at the time it was
destroyed; (2) the evidence was destroyed "with a culpable state of mind"; and (3) the
destroyed evidence was "relevant to the party's claim or defense such that a reasonable
trier of fact could find that it would support that claim or defense."  *Beaven v. U.S. Dep't
of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).  Plaintiff may satisfy the "culpable state of
mind" prong by showing that "the evidence was destroyed knowingly, even if without
intent to [breach a duty to preserve it], or *negligently*."  *Id.*  (quotation omitted).  Plaintiff
has provided no evidence that Defendant intentionally, knowingly, or negligently,
destroyed Macki's notes.[8]  Plaintiff has not met her burden of demonstrating that

---

[8] Plaintiff also seeks adverse inferences with respect to *all* of her other claims.
Because Plaintiff offers no support for these other claims they will be denied without
discussion.  *See BancorpSouth Bank v. Herter*, 643 F. Supp. 2d 1041, 1062 (W.D.
Tenn. 2009)(rejecting adverse inference claim where, "Plaintiff in conclusory fashion
maintains that the destroyed documents may have established [its claim. But], it has
offered no evidence to support its claim.").

Defendant had a culpable state of mind.

Defendant's motion for summary judgment with respect to Plaintiff's ADEA retaliation claim will be granted.

### D. ELCRA Retaliation

To establish a *prima facie* case of retaliation under the ELCRA, Plaintiff must demonstrate the same elements as under the ADEA. *Abnet v. Unifab Corp.*, 4:05-CV-11, 2006 WL 1417975, at *4 n.6 (W.D. Mich. May 22, 2006) *aff'd*, 06-2010, 2009 WL 232998 (6th Cir. Feb. 3, 2009). There is one difference: under the ELCRA, "the standard for causation is higher, in that the plaintiff must show that his participation in activity protected by the ELCRA was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Mickey*, 516 F.3d at 523 n.2. Thus, establishing a prima facie case of ELCRA retaliation is more difficult than under the ADEA.

Just as Defendant's motion for summary judgment with respect to Plaintiff's ADEA retaliation claim will be granted, so to will Defendant's motion with respect to Plaintiff's ELCRA retaliation claim.

### E. Failure to Accommodate in Violation of the ADA

To establish a *prima facie* case for failure to accommodate under the ADA, Plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) Defendant knew or had reason to know about her disability; (4) she requested an accommodation, and (5) Defendant failed to provide the necessary accommodation. *Myers v. Cuyahoga Cnty.*, 182 F. App'x 510, 515 (6th Cir. 2006) (citing *DiCarlo v.*

21

*Potter*, 358 F.3d 408, 419 (6th Cir. 2004)).  The issue here revolves around prong four.
Defendant asserts that Plaintiff's claim fails for two reasons.  Defendant first argues that
Plaintiff was provided with the only accommodation she requested.  Second, Defendant
argues that if Plaintiff did, in fact, request the accommodation to work from home on
days when she felt unwell, Defendant had no obligation to grant this request because it
was unreasonable.

### 1. Plaintiff's Request for an Accommodation

Upon return from FMLA leave, it is undisputed that Plaintiff and Milberger
verbally agreed that Plaintiff would be granted *an* accommodation.  The parties agree
that Plaintiff was allowed to work from home on days she needed to attend doctors
appointments related to her surgery or if she needed a less stressful work environment.
(*Id.* at Pg ID 307.)  The parties also agree that in a September 24, 2009 letter of
expectations, Milberger instructed Plaintiff:

> If you are not feeling well due to your FMLA health condition, you need to call
> in and not work from home that day.  The expectation is that you contact me
> directly via email or phone.  Under the federal guidelines, you are entitled to
> up to 480 hours per rolling calendar year for job protection.  You must get
> prior approval from me if you would like to work from home.

(*Id.* at Pg ID 374.)  Plaintiff argues that such language constituted a revocation of her
accommodation to work from home *when she did not feel well*.[9]  (Dkt. # 24 at Pg ID
494.)  Defendant argues that Plaintiff's accommodation did not include working at home

---

[9] Defendant points to Plaintiff's August 31, 2009 complaint to argue that Plaintiff
knew she was not allowed to work from home when she felt unwell because she stated,
"it is my understanding that when these situations [not feeling well] now arise, I must call
in sick or take the entire day off and refrain from any type of work activity." (*Id.* at Pg ID
371.)  Yet this complaint was still subsequent to Defendant's grant of an
accommodation and thus Defendant may have informally revoked Plaintiff's
accommodation before the September letter of Expectations.

when she did not feel well–as opposed to when she had doctor's appointments or needed a stress free environment–because that would have been contrary to HFHS policy.[10]  (*Id.* at Pg ID 208.)

A material factual dispute remains as to whether plaintiff ever requested the ability to work from home *when she did not feel well.*  If Plaintiff did not request such an accommodation she cannot prevail.  *See Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) ("[T]here is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee.  The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.").  In her deposition, Plaintiff testified that she asked for, and was granted, the accommodation "to work at home."  (*Id.* at Pg ID 236).  Later she explained, "I was allowed to go to the doctor's appointments . . . .[Milberger] allowed me to work from home *if I wasn't feeling well* and just to get away from the hostile environment."  (Dkt. # 19 at Pg ID 262 (emphasis added).)  Milberger, however, testified:

> A: [I]nitially when she came back there was some doctors appointments, which of course if Dorothy had a doctor's appointment, it didn't make sense for her to come in, she could work from home and why commute and all that. I don't remember exactly when but I think there was a period when she was saying I don't feel well, I'm not going to come in, I'm going to work from home.
> Q: Was she allowed to do that?

---

[10] The record is unclear with respect to HFHS's policy.  TTS employees apparently have eight hours of administrative time a week.  Yet it is unclear whether this policy went into effect before or after Plaintiff was terminated.  (*See* Dkt. # 19 at Pg ID 144 ("[Molitor] was the same for that eight hours—I can't remember if we had the eight hour policy then.  But we were trying to—if she didn't feel well then she was not allowed to work from home.  I don't remember the specifics, if she said I need a quiet work environment, can I work from home.  That I don't recall.").)

23

A: No.

(*Id.* at Pg ID 297.)  Milberger also later stated that Plaintiff was allowed to work at home

"to have the quiet less stressful work environment."  (*Id.* at Pg ID 307.)

### 1. The Reasonableness of Plaintiff's alleged Request to Work from Home on Days She Felt Unwell

Alternatively, Defendant relies on *Black v. Wayne Ctr.,* 2000 WL 1033026 (6th

Cir. 2000) (unpublished), to assert that Plaintiff's requested accommodation was

unreasonable.  However, in *Black*, the Sixth Circuit held that "where Plaintiff is able to

perform the job without accommodation, plaintiff cannot demonstrate the objective

reasonableness to any desired accommodation."  *Black,* 2000 WL 1033026 at *3.  In

*Black*, it was undisputed that the Plaintiff could perform the essential functions of her job

at the office or at home.  *Id.*  Here, a material factual issue remains as to whether

Plaintiff was able to perform her essential job functions without the accommodation.

Plaintiff testified, "the accommodation allowed me to do my work *because I was allowed

to do it at home*."  (Dkt. # 19 at Pg ID 261 (emphasis added).)  Plaintiff was terminated

approximately six weeks after her alleged accommodation was revoked.

A material factual dispute remains regarding Plaintiff's requested

accommodation.  Accordingly, Defendant's motion for summary judgment with respect

to Plaintiff's failure to Accommodate in Violation of the ADA claim will be denied.

### F.  ADA Discrimination and Retaliation

### 1.  ADA Discrimination

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must

show: (1) that she is an individual with a disability; (2) who was otherwise qualified to

24

perform a job's requirements, with or without reasonable accommodation; and (3) who suffered an adverse employment action on the basis of that disability. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). "For purposes of summary judgment only, HFHS concedes that Plaintiff has established a *prima facie* case of disability discrimination." (Dkt. # 19 at Pg ID 221.)

As with ADEA discrimination, under the ADA, once the plaintiff has made out a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for its actions. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). Once an employer offers a nondiscriminatory reason for an adverse employment action, "the burden then shifts to the plaintiff to demonstrate by a preponderance of evidence that the legitimate reason given by the employer was a pretext for retaliation." *Id.* "In order to establish pretext, a plaintiff must demonstrate that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate plaintiff's termination; or (3) the proffered reason was insufficient to motivate plaintiff's discharge." *Id.* However, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) (citation omitted); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory."). Plaintiff's response presents a plausible argument that the reason Defendant provided for Plaintiff's termination (budgetary constraints) is false, yet she provides neither argument nor evidence to support the

25

contention that the real reason was discrimination.  (Dkt. # 19.)  As noted previously,
"the non-moving party must present some evidence to show a genuine issue for trial
exists."  *Cleary v. Cnty. of Macomb*, 409 F. App'x 890, 901 (6th Cir. 2011).  Plaintiff has
not met her burden.

Defendant's motion for summary judgment with respect to Plaintiff's ADA
discrimination claim will be granted.

### 2.  ADA Retaliation

"[T]he anti-retaliation provisions of the ADA and the ADEA are nearly identical to
each other . . . ."  *Thompson v. N. Am. Stainless, LP*, 520 F.3d 644, 653 (6th Cir. 2008),
*rev'd on other grounds*, 131 S. Ct. 863 (U.S. 2011).  Therefore, because Plaintiff's
ADEA retaliation claim fails, her ADA retaliation claim does as well.  Accordingly,
Defendant's motion for summary judgment with respect to Plaintiff's ADA retaliation
claim will be granted.

### G.  Failure to Accommodate in Violation of the PWDCRA

Under the PWDCRA, a disabled individual may allege a failure to accommodate
"only if the person with a disability notifies the person in writing of the need for
accommodation within 182 days after the date the person with a disability knew or
reasonably should have known that an accommodation was needed."  Mich. Comp.
Laws Ann. § 37.1210; *see also Petzold v. Borman's, Inc.*, 617 N.W.2d 394, 398 (2000)
("In order to bring a cause of action under the statute [PWDCRA] for failure to
accommodate in employment, the employee must advise the employer in writing of the
need for accommodation.").  Plaintiff concedes that she did not request an
accommodation in writing.  (Dkt. # 24 at Pg ID 494.)

26

Defendant's motion for summary judgment with respect to Plaintiff's failure to accommodate claim under the PWDCRA must be granted.

### H.  PWDCRA Discrimination and Retaliation

"The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim."  *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012).  Plaintiff does not argue that the court should treat her PWDCRA discrimination and retaliation claims differently from her analogous ADA claims, and the record does not suggest any reason for different treatment.  *Id.*  Therefore, because Plaintiff's discrimination and retaliation claims fail under the ADA, they also fail under the PWDCRA.  Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's PWDCRA discrimination and retaliation claims must be granted.

### IV. CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 19] is DENIED IN PART and GRANTED IN PART.  The motion is DENIED with respect to Plaintiff's claims for age discrimination in violation of the ADEA and the ELCRA and failure to accommodate in violation of the ADA.  The motion is GRANTED with respect to Plaintiff's claims for ADEA retaliation, ELCRA retaliation, ADA discrimination and retaliation, failure to accommodate in violation of the PWDCRA, and PWDCRA discrimination and retaliation.

  s/Robert H. Cleland            
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 30, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 30, 2013, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522